### IN THE

# SUPREME COURT OF JUDICATURE

### OF THE

## STATE OF INDIANA,

### AT INDIANAPOLIS, MAY TERM, 1873, IN THE FIFTY-SEVENTH YEAR OF THE STATE.

———————•———————

## RABB ET AL. *v.* GRAHAM ET AL.

SUPREME COURT.—*Notice of Appeal.*—Where some of the defendants in a judgment appealed to the Supreme Court, without causing notice of the appeal to be served on their co-defendants, as required by section 551 of the code, the appellants, in the assignment of error, making said co-defendants appellees, with the plaintiffs, and alleging that said co-defendants refused to join in the appeal, the court, of its own motion, set aside the submission and continued the cause for further process.

WILL.—*Undue Influence.*—Advice, persuasion, or entreaty does not constitute undue influence. The influence that will vitiate a will must be such as in some degree to destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse or too weak to resist.

SAME.—*Power of Disposition by Will.*—A father may by his will give his property to some of his children, to the exclusion of others, and he may give it to an entire stranger, to the exclusion of his children; and it must, as a general rule, be left to him to determine the sufficiency of the reasons for so doing.

SUPREME COURT.—*Parties.*—*Notice.*—Under section 551, 2 G. & H. 270, it is the correct practice to unite with those who appeal their co-parties who do not appeal, in taking the appeal and in assigning the errors; those who appeal must then serve notice on those who do not, and file the proof thereof with

Rabb *et al. v.* Graham *et al.*

the clerk. Unless the co-parties thus notified appear and decline to join in the appeal, they will be regarded as having joined, and will be liable for their due proportion of the costs. If they decline to join, their names may be struck out of the assignment of errors on motion, and they can not take an appeal afterward, or derive any benefit from the appeal, unless from the necessity of the case, or unless they are under legal disabilities.

From the Montgomery Common Pleas.

*J. H. Brown, J. M. Butler, G. McWilliams, S. F. Wood,* and *H. H. Stilwell,* for appellants.

*T. F. Davidson,* for appellees.

DOWNEY, J.—This was an action commenced by Harriet Graham and others, against the appellants and Rhoda Ann Rabb, Mary Benner, Daniel Benner, Olive Davidson, Edward Davidson, Charles Rabb, Frank Rabb, Garrett Rabb, Webb Rabb, and Grace Rabb, to contest and set aside the last will and testament of Johnson Rabb, deceased. The parties are the children and grandchildren of the deceased. Issues were formed, and a trial by jury resulted in a verdict against the validity of the will, on which, after a motion for a new trial had been made and overruled, there was judgment setting aside the will, and for costs against all the defendants. The clerk's entry shows that the defendants prayed an appeal, which was granted on filing bond in a designated amount, with certain designated persons as security, within sixty days, from the date of the judgment, which was at the May term, 1870. This appeal was not perfected, but on the 19th day of January, 1871, a transcript was filed in this court, and errors assigned thereon by John Rabb, Smith Rabb, Levi Rabb, and Franklin Rabb, against Harriet Graham, Ferguson Graham, Margaret Sharon, John H. Sharon, Ancher Dunkerly, William Dunkerly, Rhoda Ann Rabb, Mary Benner, Daniel Benner, Olive Davidson, Edward Davidson, Charles Rabb, Frank Rabb, Garrett Rabb, Webb Rabb, and Grace Rabb, alleging that the appellees who were defendants below, refusing to join in the appeal, are made appellees by the appellants. A summons or notice seems to have been taken out against, and is returned served on, the

persons who were plaintiffs below, but no notice appears to have been served on the persons who were made appellees who were defendants below, as is imperatively required by 2 G. & H. 270, sec. 551. In this condition of the case we feel it to be our duty, although our attention is not called to the matter by counsel, to refuse to proceed in the case.

The submission is set aside, that there may be further process.

### ON RESUBMISSION.

DOWNEY, J.—This was an action by the appellees against the appellants to contest the will of Johnson Rabb, deceased, and to set aside the probate thereof. The objections urged against the will are :

1. That the deceased, at the time of making it, was of unsound mind.

2. That he was, at the time, under improper restraint and influence of the defendants, John Rabb, Levi Rabb, Smith Rabb, and Franklin Rabb.

3. That, at the time, he was under the influence and control of the last named defendants, and that the execution of the will was procured by their undue influence and control.

4. That its execution was procured by and through the deceit, fraud, improper influence, and duress practised and imposed upon the testator by said last named defendants.

A copy of the will and the probate thereof is made part of the complaint.

There was an issue of fact formed by a general denial, which was tried by a jury, and resulted in a verdict against the validity of the will. A motion for a new trial, assigning thirteen reasons therefor, was made by the defendants and overruled by the court. Final judgment was rendered for the plaintiffs. The error assigned is the overruling of the motion for a new trial.

We shall examine such of the questions presented by the motion for a new trial as are necessary to the decision of the

case, except that, as we understand the record, the ground relied upon for setting aside the will, relating to the unsoundness of mind of the deceased, was expressly abandoned on the trial, and therefore we need not decide any question which relates exclusively to that ground.

The deceased was the owner of both real and personal estate. The will is attested by George H. McNeil, John Dunlap, and Thomas H. Smith. William Conover was appointed executor, and John Rabb in case of the decease of Conover.

By his will the deceased directed that his debts and funeral expenses be paid out of his personal estate. His real estate, valued at eight or ten thousand dollars, he devised to his four sons, John, Smith, Levi, and Franklin Rabb. To his daughter, Mary Benner, and his daughter-in-law, Rhoda Ann Rabb, widow of a deceased son, he gave five hundred dollars each, which amounts were to be paid by the sons, and were charged upon the lands devised to them. To his son, Franklin Rabb, he bequeathed all the personal estate. To his daughters, Harriet Graham and Margaret Sharon, and his granddaughter, Ancher Dunkerly, he gave no part of his estate. The disinherited daughters and granddaughter, with their husbands, are the parties contesting the will. The personal estate, according to the inventory, which was in evidence, amounted to about one thousand and fifty dollars. What the funeral expenses and debts of the deceased amounted to does not appear.

The undue influence is charged to have been exercised by the sons of the deceased, the principal devisees. As one of the reasons for a new trial was the insufficiency of the evidence to justify the verdict, it is necessary that we should go through the bill of exceptions and ascertain what the evidence was, which was given to show the existence and exercise of undue influence, as well as that tending to show a cause for the exclusion of the two daughters and the granddaughter from any participation in the estate.

Shortly before the death of the wife of the deceased, he

and she broke up house-keeping, and resided for a time with different ones of their children, and afterward they made their home at the old homestead with Franklin Rabb, where they continued to live until their decease.   He was to keep them and pay the taxes for the use of the farm.   The deceased was occasionally away from the house of Franklin after the death of his wife, for a short time, at the house of his other sons.   The will was made on the sixth day of June, 1868.   The deceased died in that year, when he was seventy-seven or seventy-eight years of age.   For a year or two before his decease he was in bad health, having dyspepsia and chronic diarrhœa.   But he was able to go about until a short time before his decease.   It was proved that the deceased had often expressed himself in favor of an equal division of property of parents among their children.   He was a man of decided convictions and a strong will.   Before the death of his wife, it appears that there were some difficulties about the property.   One of the witnesses for the plaintiffs, Luke Dunkerly, testified:   "Before the old lady died, there was a disturbance at the house, and after that Johnson Rabb would not talk with me."   Andrew Ainsworth, another witness of the plaintiff, testified as follows: "John Rabb told me before the old lady's death that the girls had pretty much stripped the house ; the girls are taking things from the house, and they had better wait until the old people are dead."

A difficulty which occurred between Mrs. Sharon, and Mrs. Graham, two of the daughters, and Franklin Rabb, in March, 1868, at which Sarah D. Hutchins was present, is regarded as an important element or circumstance in the case. Mrs. Sharon says that she and her sister, Mrs. Graham, went to the house to see their mother, who was sick ; that she was not able to get out of bed.   There were at home Franklin Rabb's wife, the hired girl, Sarah D. Hutchins, and her mother ; that when they went in no one spoke.   She went to where her mother was in another room, and after a while Franklin came in and told them to go out.   She said to him

that they had as good a right there as he had. "He said Mrs. Graham had called his wife a hard name, and he wanted us to leave. He said he would go after father. I said to him to go, I wanted to see father any how, and he then started after father, who was at John Rabb's. Afterward father and Franklin came back. Father cursed and swore, and was very mad. We tried to reason with him, but he would not listen to us. I asked father why he allowed Franklin to act that way, and he said he was only a boarder with Frank, and Frank had control there, and that Frank said we were there making a fuss with his wife. The old lady told Frank to go out of the house, and Frank said he had heard of our coming and intended to order us off." Mrs. Sharon did not go to the house on the occasion of her mother's funeral, went to the place of burial, but did not speak to her father. She did not go to see her father after her mother's death. Frank went after his father on the occasion of the difficulty, on horseback. Frank's wife was cleaning house. She does not know what bitter things she has said about Frank's wife. Mrs. Graham says she and Mrs. Sharon were with their mother, and Franklin came in and ordered them out, "and said he would go and bring father. Father came and said Frank owned everything, and he was but a boarder." When Frank first came in and began to talk to them, his mother spoke to him, and he shook his fist under her nose and told her to keep herself quiet. "The old man, when he came, cursed and swore, and ordered us out of the house. My mother died in May, 1868, and I had no notice of her coming death. After she was dead, Conover came and told me when the funeral would take place. I was at the grave-yard when mother was buried. My brothers, Smith, John, Franklin, and Levi, were there. I did not see the old man after our visit to mother." She testified, that when Frank told her and Mrs. Sharon to leave, he said she had called his wife a b—ch. She denied that she had used the word.

Sarah D. Hutchins testified, that she was at the house of Frank Rabb, when Mrs. Sharon and Mrs. Graham came

Rabb *et al. v.* Graham *et al.*

there; that Frank came in after they had been there a while, and told them that they had called his wife a b——ch, and that they must leave. They said he had no right to order them away; he said he would go and get his father, and went and got a horse and went away. When he returned his father came on horseback and Frank walked. "When the old man came in he asked what the fuss was about. Mrs. Sharon said they had not raised a fuss. He did not say anything about being dissatisfied about their being there. He said he had given up everything to Frank; that he was only a boarder. Nothing was said between the women before Frank first came in, except that Frank's wife called Mrs. Graham a b——ch. Heard Frank say to the old man that he ought to make a will and give his property to the boys, and not leave the girls anything. The old man said he would as soon as he could get his buggy home. This talk was at the breakfast table, about a week after the trouble between Frank and Mrs. Graham and Mrs. Sharon." This witness was seriously impeached by proof of contradictory statements made out of court, the foundation for which was laid by putting the proper preliminary questions to her.

Nelson Crane testified, that John Rabb stated after the above named difficulty, "there will be a will made now." Mrs. Crane, on behalf of the defendants, testified, that Sarah D. Hutchins told her within a day or two after the trouble at Frank Rabb's, that the fuss was begun by Harriet Graham going to the door of the room where Mrs. Frank Rabb was, and that when Mrs. Frank Rabb looked up, Mrs. Graham said to her, "It is not you I am looking for, you b——ch."

Mrs. Elizabeth Crane testified, that Sarah D. Hutchins related to her the origin of the difficulty in the same way. John Rabb testified to the same, and also that Frank went to live on the homestead with his father upon the advice and at the request of himself and Levi, after Mrs. Graham had declined to go. He also testified, that he never used any persuasion or any inducement of any kind, or any influence

to induce his father to make a will. His father had told him that he would make a will, directly after the fuss and before his mother's death.

Sarah Conover testified, that she saw Ancher Dunkerly riding by the house of the deceased, with her husband, on the day of the funeral of the wife of the deceased; that they went by fast; that the deceased saw them as they went by, and said: " It would have been for Ancher's own good if she had come in. I'll fix my property, if I can, so that the girls won't get any of it."

Levi Rabb testified, that he used no influence to get his father to make a will. He heard him say he intended to make a will.

Frank Rabb testified as follows : " I was out at the sugar camp and came home. When I got there, I heard mother crying. I came into the house. Mrs. Sharon ordered me out of the house, and told me that there was law for me. I went over to John Rabb's and got father, and he rode the horse back over the road, and I went home across the fields. When I got home, a boy was holding the horse. I never heard father say anything about making a will. I did not know about the will until after father's death. I never had any such conversation as testified to by Sarah D. Hutchins. Father controlled the farm and directed when to put in grain. I moved into the homestead in 1867, at the request of father, and John, and Levi. I told Mrs. Sharon, if she could not behave herself to go home."

Smith Rabb testified that he never had any conversation with his father about a will before or after it was made. On the day he made the will, he requested witness to get some one to write it. He was then at witness's house, at Perrysville, and said he would make his will and go home the next day. Witness told McNeil what his father wanted, and afterward, at his request, got witnesses to attest the will. Did not know of the contents of the will until after his father's death.

George McNeil, who wrote the will, and whose testi-

mony is quite full, testified as follows, omitting some immaterial parts: "I wrote this will on the 6th day of June, 1868. In the morning, some one, I think it was Smith Rabb, came to my store, and told me that the old gentleman, Johnson Rabb, wished to see me up at Smith Rabb's house; that he wanted me to do some writing for him. As soon as I could leave the store, I went up to Smith Rabb's house. Smith Rabb lives about two squares from my store. I went into the house and found Johnson Rabb in the east room. He was alone. I bid him the time of day, and sat and chatted with him for a little while. Pretty soon he told me he had sent for me and wished me to write a will for him. He said he had previously not intended to make a will, but that circumstances had transpired in his family which wounded, grieved, or hurt him very much (my best impression is that he used the word hurt), and that he had changed his intention and wished to make a will. He went on to say that he could go on and give me a detailed statement of the circumstances, if necessary, but that he did not think it necessary for the present purpose. I then asked him to give me a memorandum or statement of the way he wanted his will made. He then went on to give me the statement of his property, gave me the quantity of his real estate, said he had some money out, some notes and accounts, some threshed wheat and personal property on the farm. He then went on to tell me how he wanted the bequests made. He suggested that the lien for the legacies to Mary Benner and Rhoda Ann Rabb should rest on the land until paid, and that these legacies should not be paid out of the personal property. I made a memorandum as he told it over to me, and after he got through I had him to restate it all again, to see if I had it right. He related it all over again, just as he had before, and just as it is in the will. I then took the memorandum and went to my store, and along as I had leisure, I wrote out the will. After dinner I took the will up to the house, and found Johnson Rabb in the same room he was in in the morn-

ing. He was alone. I read the will all over to him carefully, and then re-read it, I think; at least that is my custom, and I am quite confident that I read it to him a second time. He said it was all just as he wanted it to be, and requested me to go and bring some witnesses to witness the will. I left the will with him and went down in town to get some witnesses. As I passed by Smith Rabb's store, I told him to get some good men; think I suggested to him Thomas Smith, and think I myself spoke to Dunlap to be one of the witnesses. The old gentleman selected Capt. Conover as executor, and in case of his death, John Rabb. Mr. Dunlap, T. H. Smith, and myself went up to the house, and the old gentleman in our presence signed the will and had us witness it. The will was not read over in the presence of the witnesses, but Johnson Rabb stated that it was his will, and that he wanted them to witness it, that he understood it perfectly, and that it was right. After the will was executed and witnessed, I handed it back to Johnson Rabb. He took it and said he would keep it in his possession until he could put it in the hands of Captain Conover. I thought he was fully capable of doing business. I could perceive no abatement of his mental force and vigor. He was not, perhaps, quite so quick, but as correct as ever. He was a man of more than ordinary intelligence, not highly educated, but a man of strong mind. He was a man of strong will and firm purpose. I could discover no influence or restraint whatever exerted over him to induce him to make the will. He was perfectly free to go and come when and where he pleased. None of the Rabb boys were in town that day that I know of except Smith, and he was down at his store at each time I was at the house. No one was present at my first two visits to the house, and no one except the witnesses to the will the last time, except, perhaps, one of Smith Rabb's girls came to the door once. No secrecy was enjoined as to the will.

"Smith Rabb asked me to go and see the old gentleman; said he had sent for me. The old gentleman was then an

inmate of Smith Rabb's family. I had seen him there frequently. I think it was the circumstances which he said hurt him that induced him to make the will. The old man, in the presence of Dunlap and Smith, said that he fully understood the will and wanted them to sign it as witnesses. I mean that if there was any influence or restraint there operating upon him, he was perfectly able to get up and go away from it. There was no physical restraint of any kind whatever. The old gentleman was perfectly free to go and come when and where he pleased. I think he went home the next day after the will was made. I know nothing of any antecedent agencies brought to bear upon him to make a will."

Mrs. Graham was recalled and testified that Mrs. Sharon did not order Franklin out of the house, and it was admitted that Mrs. Sharon, if present, would testify to the same thing.

This is all the evidence which tends to the proof of the allegations in the complaint, other than that relating to the unsoundness of mind of the testator. We may say that after a careful reading of the evidence with reference to the unsoundness of mind of the deceased, we think it wholly fails to establish the fact. The question then is, does the evidence which we have set out show that the execution of the will was procured by the means stated in the complaint? We are of the opinion that it does not. Undue influence exercised by the sons, and especially by Franklin, is relied upon. We see no evidence of it. If he said, as testified to by the impeached witness, Sarah D. Hutchins, to his father, which he positively denies, that "he ought to make a will and give his property to the boys, and not leave the girls anything," this was far from undue influence, and was not complied with by the father, for he did bequeath to two of the girls a part of his estate. If it is supposed that he may have unduly influenced his father by what he said to him when he went after him to John Rabb's at the time of the difficulty and the calling of bad names, it is enough

to say that there is no evidence of any such thing, not even of the speaking of a single word to him on the subject. Advice, persuasion, or entreaty does not constitute undue influence. "The amount of undue influence which will be sufficient to invalidate a will must, of course, vary with the strength or weakness of the mind of the testator. The influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead one naturally strong and unimpaired. But in every case the influence that will vitiate a will must be such as, in some degree, to destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse, or too weak to resist." 1 Jarman Wills, 37, *et seq.; Kenworthy* v. *Williams*, 5 Ind. 375; *Noble* v. *Enos*, 19 Ind. 72.

With reference to the difficulty at Franklin Rabb's, it may be said that the father had full opportunity to enquire into it and learn its exact character, and it may be presumed that he did so inquire. If he ascertained the fact to be that the daughters came to the house only two weeks before their mother's death, and got up the difficulty which ensued; if they followed it up by unkindness to their father, refusing to go to the house and join in the burial rites of their mother; and if, though they were at the grave, they refused to associate with or speak to their father, it is not for us to say that his will, in which he disinherits them, shall not stand. We think that all the evidence in the case points to this difficulty and the subsequent deportment of the daughters as the causes for their exclusion from any participation in the estate.

As to Ancher Dunkerly, she was a granddaughter of the deceased, had been taken into his family at the death of her parents, in her infancy and helplessness, and reared and provided for by him and his wife. Under these circumstances, it might be supposed that she would have hastened to her aged and bereaved grandfather, and united in paying the

respect to the deceased which the ties of kindred and the obligations of gratitude required. There had been no previous difficulty, so far as she and her husband were concerned. But this she did not do; but, on the contrary, according to the evidence, passed by the house rapidly on the day of the funeral, not deigning even to stop. What wonder if such ingratitude should pierce the old man's heart, and cause him then and there to resolve that it should receive its proper reward! A father may, by his will, give his property to some of his children, to the exclusion of others, and he may give it to an entire stranger, to the exclusion of his children; and it must, as a general rule, be left to him to determine the sufficiency of the reasons for so doing.

There are other questions in the record which we would have to consider before we could affirm the judgment, if the evidence was regarded as sufficient. But as we think the evidence is insufficient, we need not examine them.

The judgment is reversed with costs, and the cause remanded, with instructions to grant a new trial.

### ON PETITION FOR A REHEARING.

Downey, J.—A petition for a rehearing has been filed in this case in which we are asked to review our decision upon the point decided in the case; and we are asked to grant a rehearing on two grounds not mentioned in the opinion, but which were necessarily decided in arriving at the conclusion stated in the opinion. Upon the question as to whether the evidence established any of the alleged causes for contesting the will, we see no reason to change the decision announced in the opinion.

It was claimed in the brief of counsel for the appellees, that the bill of exceptions setting out the evidence was not properly in the record, because, as was insisted, the record did not show that it was filed within the time given by the court. This position was so clearly unsupported by the

record that we supposed it unnecessary to speak of it in the opinion, and left it to be inferred that the objection was not allowed, by deciding the case as though the bill of exceptions was properly in the record. The facts are, as shown by the record, that time was given by the court to the defendants, on overruling the motion for a new trial, " until the 3d day of August, 1870, in which to complete and file their bill of exceptions to the rulings of the court in said cause." In the record immediately preceding the copy of the bill of exceptions containing the evidence, and evidently relating to the time of its filing, are these words: " Filed June 17th, 1870, Wm. K. Wallace, Clk." · At the conclusion of the bill of exceptions, preceding the signature of the judge is this statement :

" And to the overruling of which motion by the court, the defendants, at the time, excepted, and tender this, their bill of exceptions, and pray that the same may be signed and sealed by the court, —— day of June, 1870." Counsel now insist that the bill of exceptions " does not show a signing in time; that it only shows that the judge was asked to sign it on the —— day of June, 1870. Whether then signed or not, does not appear." We think the learned counsel would have us indulge too much skepticism upon this point. The bill of exceptions was certainly signed before it was marked filed by the clerk on the 17th of June, 1870, which was within the time limited.

The other point made, which is not referred to in the opinion, grows out of these facts. In the assignment of errors in this court, John Rabb, Smith Rabb, Levi Rabb, and Franklin Rabb, are named as appellants, and Harriet Graham, Ferguson Graham, Margaret Sharon, John H. Sharon, Ancher Dunkerly, William Dunkerly, Rhoda Ann Rabb, Mary Benner, David Benner, Olive Davidson, Edward Davidson, Charles Rabb, Frank Rabb, Garrett Rabb, Webb Rabb, and Jane Rabb, are made appellees, it being stated that " the said appellees who were defendants below, refus-

ing to join in the appeal, are made appellees by the appellants." The appeal was submitted in this shape, without any objection from any one. But when we came to decide the case, we found that process had been served on the appellees who were plaintiffs below, but never had been served on the appellees who were defendants below, but who had not joined in the appeal. Not thinking it proper to dispose of the case until all those who were to be affected by the decision had been notified, the court, of its own motion, set aside the submission, that there might be process served on the other appellees. This was done on the 30th of May, 1872. Afterward new process was issued and served on some of those who had not been served, and as to the others the counsel of the appellees entered their appearance, in writing, in the clerk's office, stating that they declined to join in the appeal, no objection being made that they should have been named as appellants. The cause was then again submitted, on the 27th of November, 1872, by agreement. On the 16th day of December, 1872, a written request was made by counsel for appellants, that the cause be placed in the order on the docket in which it stood at the time of the previous submission, in order to obtain an early decision. Counsel for appellees joined in this request in this form. "I join in the above petition to the court, and add that the submission was probably set aside under a misapprehension of the condition of the record as to the necessary parties. The parties for whom summons was ordered were, with one exception, not parties to the suit, though named in the complaint. They were not necessary parties, and were not such in fact. As to the exception, an appearance is entered upon the record. The parties were simply named as being heirs. It was not necessary, under the statute, to make them parties. Sec. 39, p. 559, 2 G. & H. Under this section, any one of the parties may contest, and the executor and other persons beneficially interested only are to be defendants. These were the only defendants. I think it would be but

simple justice to reinstate the cause, and earnestly ask that it be done.    The estate is suffering from delay.

"THOS. F. DAVIDSON, for appellees."

On the fly-leaf of one of the printed copies of the appel-lees' brief, there is this statement, in pencil, without date: "I desire to call the attention of the court to the fact that the parties not joining in the appeal have not yet been properly made parties here.    The submission has once been set aside for this reason, and I now ask that the appeal be dismissed for this cause.    To dismiss is the practice of the court.                                    THOS. F. DAVIDSON."

The cause was not advanced as requested, but was decided at as early a day as the other business of the court would allow, and the opinion was filed on the 15th day of September, 1873.

Counsel for appellees now urges in the petition for a rehearing, that "the court ought not to have considered the case at all over the objection of appellees, because there has never been a valid assignment of errors.    All the appellees, except Mrs. Sharon, Mrs. Graham, Mrs. Dunkerly, and their husbands, should have been appel-lants, and the assignment fails to show why they are made parties at all.    This objection was insisted on by appellees, and has apparently not been noticed by the court." We think it must be evident from this statement of the facts, not only that the objection now urged was never made before, but that it was expressly waived by the counsel now urging it.    The parties affected by the decision were all duly notified of the appeal, and we think it is now too late, under the circumstances of this case, to urge an objection that some of them were named as appellees, when they should have been named as appellants.    Under section 551, 2 G. & H. 270, it is the correct practice to unite those who do not appeal with those who appeal, in taking the appeal and in assigning the errors; those who appeal must then serve notice on those who do not, and file the proof thereof with the clerk of this court.    Then, unless the parties thus noti-

Rabb *et al. v.* Graham *et al.*

fied appear and decline to join in the appeal, they shall be regarded as having joined, and shall be liable for their due proportion of the costs. If they decline to join, their names may be stricken out on motion, and they shall not take an appeal afterward, nor shall they derive any benefit from the appeal, unless from the necessity of the case, except persons under legal disabilities. When the section in question says the names of those who decline to join in the appeal may be stricken out on motion, it must mean, we presume, that their names are to be stricken out of the assignment of errors, which is the foundation of the proceeding in this court; and unless their names had been first inserted in the assignment of errors, there would be no propriety in saying that they should be stricken out. Several appeals have been dismissed for non-compliance with this section, when they were taken by part only of the co-parties, and there had been no compliance with the requirements of the section, and when there had been no waiver of the objection. The reason why the appeal in this case was not dismissed on the first hearing of it was, that all the parties had been mentioned in the assignment of errors as parties in this court, on one side or the other, and the only question then was, that process had not been fully served on the parties named as appellees. We are referred to the case of *Aylesworth* v. *Milford*, 38 Ind. 226; and we are asked to examine the record in that case, and are assured that it is, on this point, like the case under consideration. We have made this examination and find the facts to be, that the judgment in the common pleas was rendered against Aylesworth and McElroy; Aylesworth alone appealed, but he made McElroy an appellee with Milford, the plaintiff below, and he was notified to appear in this court as an appellee, " and defend said appeal," etc. This was not regarded as a compliance with said section, and the appeal was for that cause dismissed by the court. There are two important particulars, at least, in which these cases differ. In the case we are

considering, the assignment of errors shows that those named as appellees, who were defendants below, are made appellees because they refused to join in the appeal, while in the case cited, there was no such statement in the assignment of errors; and, second, there was, in that case, no waiver of the irregularities as there has been in this case. Had it not been made necessary to state the facts of the case as we have done, in disposing of the petition for a rehearing, we should not have regarded it as either useful or desirable to do so.

The petition for a rehearing is overruled.